The next case today is Luis Gonzalez-Caban et al. v. JR Seafood Inc. et al. Appeal number 19-1450. Attorney Agra'it Yaddo, please introduce yourself for the record and proceed with your argument. Good morning again to the court and counsel. Jaime Agra'it Yaddo, representing Appellants, and we would like to reserve three minutes at the end for rebuttal if necessary. Certainly. You may have three minutes. All right. Thank you, Your Honor. We believe that we were able to convey Appellant's position on the briefs, but we would like to take this opportunity to clarify just a couple of important points in this hearing for the Court's benefit. First, as we know, in this case for damages based on a food intoxication incident, the District Court entered a summary judgment because it concluded that Appellants did not have the necessary medical evidence to establish that a saxitoxin intoxication occurred because the Court concluded the medical evidence on that regard was speculative. However, the record shows that the medical experts on both sides agree that Appellant's used the correct method to establish that a saxitoxin intoxication, in fact, occurred. Mr. Agra'it, pardon me, but the motions for summary judgment did argue the insufficiency of the medical evidence, but as to each of the defendants, they also argued that either they did not distribute the shrimp in question, and so they drop out of the causal chain, or in the case of the restaurant, that they were under no duty to do anything other than what they did do. So, let's just assume, arguendo, that you get by the medical causation issue. You still have to address these other arguments. Could you take them one by one, please? Start with the that Appellants are presenting, and as was confirmed by the liability experts for Appellees, their food experts, all of the parties, including the restaurants, had a duty to look back at the safety practices of the harvester in order to discharge their duty to diligently check for the in the case of saxitoxin, it only occurs at the origin. It happens in the harvest water. Therefore, they have to make sure that they are obtaining a wholesome shrimp by knowing who they're buying from. Where does this duty come from? Is it statutory? Is it regulatory? Is it a good practice of the industry, based on the testimony even of Appellees' own food expert, Dr. Mendonca? He specifically testified that the good safety practice was to look back and make sure that the with safety. The shrimp in this case did not even go through customs. It did not even clear customs. There is nothing normal about what happened to the shrimp in this case, to this particular product. Mr. Agrede, perhaps this is a follow-up to Judge Lopez's question. So I take it you're not saying there was a statutory or a regulatory duty, but there was a sort of understanding in all aspects of the industry. Okay, I'd like to go back to the restaurant. I thought that the argument was simpler as to the restaurant. There is no doubt it supplied the shrimp. I thought the argument was any restaurant has a duty not to poison its patrons. The fact that your client has medical evidence that tends to support a food we cleaned the shrimp that they in fact could not have or the injury would not have happened. That's what I thought your argument was as to the restaurant, totally apart from this general industry duty. Did you assert such an argument to the district court? That is correct. That is our argument regarding the restaurant, but we should add that the duty to investigate the source of the shrimp applies to everyone equally. And again, this is what all Before you get into the duty to investigate, just sticking with Judge Lemp's question, what is the failure to clean allegation that you made? We are alleging, and this is a matter of credibility for the jury, that if the shrimp would have been cleaned, it would have reduced the chance of an intoxication. It doesn't eliminate it completely though. And this is why the second part of our theory comes about, because then they have to know who their supplier is and the safety practices of the harvester. Does that mean your argument is dependent, even as to the restaurant, on there being a duty to investigate the safe waters? No. So just forget the duty to investigate the safe waters. Just with the cleaning and the restaurant. Okay. What is the allegation and what does the record show that would provide a basis for a juror to conclude that there was a failure to clean in the way that, I guess it's got to be some duty of care in cleaning wasn't followed? You're not disputing that it was de-veined? Well, we believe that this has to be examined by a jury, because it is a self-serving... No, I'm saying you're not saying there's a dispute of material fact as to whether the shrimp was de-veined, are you? Well, what we are saying is that there is only one witness to testify as to that, and that is the person who allegedly the cook who handled the shrimp. He says he de-veined. So you think there is a dispute of fact as to whether the shrimp was de-veined? Correct, because he would have to testify that in front of a jury and be believed. And is there testimony that had the outer shell and the de-veining taken place, the likelihood of poisoning would have been considerably less? That is correct, Your Honor. And where is that? Dr. Goldstein, Appalachian food expert, so testified he did qualify, however, that de-veining doesn't completely eliminate the risk, but it does reduce it. And then the restaurant would have to send his witness and the witness would have to be believed. And of course, the fact that there was saxitoxin by medical standards at the end confirms that there was enough saxitoxin in that shrimp to cause the damage. Counsel, this question does not go to medical causation. It goes to foreseeability and what duties the restaurant and others in this chain might have had to assure the safety of the product. I thought there was evidence in the record that this linkage between the saxitoxin and this notion that routinely shrimp can cause these disastrous consequences, that is not at all a common association. I thought that, again, the evidence was that this is virtually almost unheard of that shrimp could be linked to this kind of outcome. And again, this goes to the distribution chain. Yes, Your Honor, thank you for that question. That is one of the topics that we wanted to clarify in this hearing so that notion can finally be laid to rest. Basically, if I understood Appalachian's position and your concern is that if defendants or Appalachians, I should say, established that saxitoxin intoxications were infrequent, they could not have taken measures to prevent Mr. Gonzalez-Caban's intoxication. However, the frequency of the intoxication of this type of intoxication has no bearing on Appalachian's capacity to prevent such an intoxication and we will explain why. It should be made clear that Appalachian's claim is not based on their capacity to prevent a specific contaminant, but rather on the notion that if a reseller buys shrimp in the blind without a proper background check on the safety practices of the harvester, a contaminant, regardless of which contaminant, is more likely to show up in the food. This background search was testified to by Appalachian's own liability experts and food experts and it definitely confirms that in this case, it just so happened that it was saxitoxin, but antibacterial measures could have prevented this and those are taken on a regular basis because saxitoxin is produced by bacteria in the harvest water, so they could have done something to prevent it and they didn't. Okay, you have some time reserved. We'll hear from counsel for the various defendants. Thank you, Attorney Egrett. At this time, please mute your audio and your video. Attorney Lopez de Victoria, I believe you're going to speak first for five minutes. Yes, if it please the court. Counsel for appellants talked about several issues that I think were important to focus on. First of all, there was no established duty, either good practice, regulatory, statutory, or otherwise that required the restaurant, which is who I represent, to do more than they did in relation to the cleaning and the handling of the shrimp before it was served. Does that depend on the shrimp having been cleaned and deveined? Yes, it did and there's evidence that that was done. There's no evidence. Why wouldn't that be? Well, isn't the evidence that it wasn't done that if they don't believe the one person who was in a position to say that it was done and then you see the result, why wouldn't that be enough to have to be just a jury question? I don't think it is. Here, the gentleman who actually did the cleaning of the shrimp, who was the cook, Mr. Cruz-Otero, he was certified by the Puerto Rico Health Department as far as handling food and he testified that he followed the same protocol that he has always followed in relation to food. I would add to that that you would have to look then at whether there's been other instances of contamination or food poisoning with people who have consumed food that he has prepared. You don't even have the other person who ate from the platter getting sick by having consumed the shrimp. It would be a one in a million lottery for only one shrimp on that platter to be contaminated and it happened to be the shrimp that was consumed by Mr. Gonzalez. Now, I think you're going to the question of whether the shrimp was contaminated, but if the question is assumed there was a basis for a jury to find that there was a contaminated shrimp on platter and that the plaintiff ate it, the question is whether it was cleaned properly. Why isn't that just a jury question? Because there's one person saying, I cleaned it. They'll say he's not believable. Look what happened. Or is that not enough? What would they have to put forward to create a genuine issue of dispute of fact as to whether you debate the shrimp? And I think you have a different challenge, which is about causation, but I'm just saying if we put that aside for a second, just on the point about the duty of the restaurant with respect to cleaning the shrimp. Well, I think I would have to either put forward some evidence that in this particular instance, Mr. Cruz did not follow the procedure that he normally followed with respect to cleaning all shrimp. And that evidence is not in the record. I know, counsel, the argument is that the very fact that he had this severe reaction and if the medical evidence tying it to contaminated shrimp is adequate, that then means a self-serving declaration from the chef at the restaurant does not in and of itself establish as a fact that the shrimp was deveined and cleaned as it was supposed to have been. And I suppose your argument is merely disbelieving and assertion is not enough to survive summary judgment. You need a bit more. And assuming that's your argument, if the district court got it wrong on medical causation, why isn't that sufficient? Well, I think first to get to the point of whether the shrimp was cleaned properly or not, you would have to reach another hurdle, which would be first, was the shrimp in fact intoxicated with saxitocin? And there's no evidence in the record, medical or otherwise, that that was the case. No, I disagree. And you, I'm sorry, maybe Judge Barron will have better luck. Well, I think she, I think Judge Lynch is like me. We want you for purposes of this part of the analysis to assume, and I know you dispute it and I understand why you do and the district court agreed with you, but just for purposes of this part of the analysis, assume that there was enough evidence to permit a jury to find that the shrimp was contaminated. We then get to the question of the restaurant's liability for that and you have another defense, which is, well, even if that's true, we didn't do anything wrong because we cleaned it properly. And I think the concern with that contention is, well, the evidence that you cleaned it properly is a declaration by the chef as to what he did. But if there's medical evidence showing that there is a much higher likelihood that the shrimp will be contaminated if it was not cleaned properly, why couldn't a jury say, well, I hear from him, but I don't have to believe him. If I don't believe him, then doesn't the medical evidence suggest that it wasn't cleaned properly? What's wrong with that argument? I don't think the record supports that argument. I would have to go back then to whether or not it was foreseeable in their handling of the fish that someone would become ill or not. And I think just the... if it had not been deveined and handled properly, a contaminant might well have caused some sort of food poisoning. And if that is so, then as to your client, as opposed to other clients, the issue comes down to a credibility determination as to whether it was, in fact, properly cleaned before it was served. Yeah, I don't think that I've conceded that it was that the shrimp has some contaminant. And I don't think... No, no, no, no, no, no, no, no, no, no. Yeah. Let's assume the medical evidence was sufficient to create such a linkage. I know you dispute it, but that's the operating assumption here. The operating assumption is that it was not properly cleaned and the gentleman became ill. No, that it was contaminated shrimp and that the chances of food poisoning would have gone down considerably if it was properly cleaned. And that your client's mere assertion that it did properly clean it is put up against the fact that a jury could find that his eating the shrimp was attributable to the saxitoxin and the lack of cleaning. Yeah, I would still have to go back to the foreseeability then of... I mean, saxitoxin contamination of shrimp is something that is extremely rare. There have been no reported cases in the United States and none of them are related to the ingestion or consumption of shrimp. Well, counsel, I think that Appellant's point seems important in this sense. I mean, the very fact that the chef on behalf of the restaurant went to the trouble to describe in detail what he had done to prepare the shrimp, you know, is an acknowledgement that he had a I guess it's a good practice, if nothing else. When we serve shrimp, we take the shell off, we devein it and whatever else he testified he did before serving it. And Appellant's response is that's what you do and you don't do it because of one specific contaminant or another. You do it to prevent people from getting sick, whatever the reason might be, if the shrimp is contaminated in some way. So I think there's an acknowledgement of the duty. There's an awful consequence. And if we disagree with the district court judge that medical causation wasn't established, seems to me your client's in a bit of trouble. This probably should be a jury issue as to whether he really did what he apparently acknowledges he should have done. He says he did it. The consequences suggest he didn't do it. So why isn't there a jury issue there? I still don't think I understand what you're saying, but I don't see, given the unforeseeability of an event like this, the fact that there was a practice that was followed by the restaurant on a normal basis, the fact that no one else, the other person who consumed the shrimp that were served, prepared and served by the restaurant, the other person did not become ill in any way. I think all those factors. That sounds like a good jury argument. Well, somebody else was served and they didn't get sick. That sounds like a good jury argument, but I'm not sure that's an argument for keeping it from the jury. But there's no evidence to counter that Mr. Cruz did not do what he normally does in serving the shrimp. There's no evidence that the shrimp had saxitoxin or that the gentleman had saxitoxin poison. Can I ask you a point in between the question of whether the shrimp was contaminated? I want you again to assume the shrimp was contaminated. What is the state of the record with respect to evidence about the effect of cleaning the shrimp on reducing the chance of saxitonin? Is there much on that in the record? There really is not, your honor. There really is very little on the record, other than what Mr. Cruz did in terms of cleaning the shrimp before he prepared it for service. There's very little. Was there medical expert testimony or evidence in the record of any kind regarding the effect? Because actually, I thought the record was a little bit unclear whether, to the extent the shrimp could be contaminated, how much deveining would affect the likelihood of the shrimp being contaminated if it was? Yeah, the deveining is, at least from what the experts testified, deveining, and I should clarify something, the shrimp did not have a shell on it. It was basically cleaning it and then deveining it completely. Mr. Cruz testified that he also verified the shrimp for any viscera, which is where they claim that saxitoxin would be lodged if the shrimp were in fact contaminated. You know, I asked a similar question of your opponent, and he said, yes, our expert Dr. Goldstein did opine that the proper cleaning and deveining would have reduced the risk of getting the food poisoning, assuming the shrimp had been contaminated. Do you dispute that? I disagree with his statement of what Dr. Goldstein testified. I think Dr. Goldstein testified in general terms as far as all shellfish, but then you'd have to go back to the infrequency and almost rarity of saxitoxin as a contaminant lodging in shrimp, because it's not among crustaceans such as lobster and crabs where such a contaminant could occur or in mollusks. It doesn't go back to this. That goes back to Judge Lopez's question then about, so why do chefs and restaurants take this step of cleaning and deveining, whether it's a specific risk of saxitoxin or some other food poisoning, and at least in the common world, shrimp are notorious for possibly setting off food poisoning events? Yes, I think that's just done as a matter of course and as a matter of just the same way that they use different types of knives or different types of cutting boards or whatever for different kinds of food so that there's no type of cross contamination. So there's those, at least at the end service, there are those measures that are undertaken by Mr. Cruz in his preparing and service of the shrimp before we serve. I just want to make sure that we're in agreement about what the argument of your opponent was. We've been asking you questions on the assumption that the plaintiff below made the argument that there was a genuine issue material fact as to whether the shrimp was deveined and cleaned. Is your understanding that that argument was made below? Because at least some of the briefing makes me think that the plaintiff's argument was that whether or not it was deveined and cleaned, the shrimp posed a risk by virtue of having the saxitoxin in it. Do you see what I'm getting at between the difference between those two arguments? Yes, yes. Yes. Your opponent represented that he made both arguments. So the question is, what is your view on that? My recollection is that there wasn't any specific argument necessarily tied to the cleaning of the shrimp and the end use. The focus of his arguments in this case is that at the harvesting level of the shrimp before it's even packaged and shipped forward, that's where everyone would have to go back to it because that's where they would have to do the testing. If that were the only argument, your point is that at the restaurant level, there's no duty, assuming you've cleaned the shrimp, to know that you should do anything more to protect against the saxitoxin. Exactly. The restaurant complied with its duty to clean and prepare the food as is recognized in the industry and how he has been trained to do it, but there's no duty beyond that to test the shrimp for any type of contaminant. Okay. Thank you. Thank you very much. Thank you, Counsel. Attorney Lopez de Victoria, at this time, if you could please mute your devices and we would ask that Attorney Gonzalez please unmute her device and introduce herself to begin her argument. She has a three-minute period. Thank you. For the record, Miriam Gonzalez-Olivenza representing the Puerto Rico Guarantee Association. Your Honor, I'd like to clarify the record first. Appellant posed the argument that in the lower court, they argued that to clean the shrimp would reduce the occurrence of saxitoxin. As I understand it, that was an argument that was never made in the lower court, and as a matter of fact, defense experts said, our defense experts said, Walter Otwell, that even cleaning the shrimp could not remove the saxitoxin from the shrimp itself. Normal cooking methods or processing methods or boiling methods would not remove the saxitoxin from the shrimp. I don't think that if that had been an argument that Plaintiff Appellant would have made in the lower court, then why bring in the importers or distributors just as JRC Food, which is the insured for the Puerto Rico Guarantee Association? Well, the short answer to that is the one your opponent gave, which is he made both arguments. The broader general industry duty that applies to other people and as to the restaurant, a more specific duty. Did your experts say it made no difference to the level of risk of saxitoxin poisoning, whether the shrimp was deveined and cleaned? Yes, your honor. They specifically said that it does not respond to changes in temperature nor cooking and can't be eliminated by conventional handling and processing methods. Well, counsel, doesn't that if that's true, doesn't that suggest that there is a duty earlier in the distribution process, perhaps going back to the importer or the harvester. If at the end, cleaning and deveining is not going to prevent somebody from getting very sick, all the more reason that those earlier in the process take steps to prevent this kind of contamination that cannot be avoided by cleaning at the end state. Doesn't that suggest that your clients had a duty to take steps to prevent this from happening when the restaurant really couldn't do anything about it? Well, first of all, your honor, that would go to foreseeability. And just as Mrs. Lopez said earlier, between 2000 and 2009, there was no record whatsoever of shrimp being contaminated by saxitoxin to cause paralytic shellfish poisoning as occurred in plaintiff. And second of all, with regards to JRC food, there's no link whatsoever between the sale of the seafood to Packard's provision and that Packard's provision sold this exact shrimp to GB Trading, who in turn sold it to the restaurant. None, no link whatsoever, your honor. So there's a three-pronged test for Article 1802 in Puerto Rico. First of all- That's time. I have finished. Go ahead. Okay. There's a three-pronged test. You have to prove a damage. You have to prove the causal nexus between that damage and you have to prove negligence. And negligence also includes foreseeability. If no shrimp had been contaminated with saxitoxin between 2000 and 2009, JRC food could never have anticipated that an occurrence of this type would have happened. I guess the question is, is the right level to focus on for foreseeability, this particular contaminant or a contaminant? No, this particular contaminant, your honor. Is that clear under Puerto Rico law? In other words, in your view, it would seem like you can get shrimp from anywhere. But is your point that only if the contaminant that then happens to be in it is one that they could have foreseen might have been in it, that's the only way they could be liable? That's under 1802 in Puerto Rico. That's correct, your honor. It has to be foreseen. It's not foreseeable because it never happened. In fact, there's no history of saxitoxin occurring in shrimp ever. I just have one question. The plaintiff asserts that these shrimp actually came from non-existent. You keep citing the 2000 to 2009 statistics. Is there anything that says that Indian shrimp were frozen and being imported during that time period? Well, your honor, the plaintiff contends that in 21 CFR 123.12, there's a duty to- No, please answer my question. As part of the defense case, was there any evidence that you say because there was no illness reported, that means we're off the hook? The plaintiff has said, look, this was frozen shrimp from India. Maybe that was new to the market. Did you put on any evidence that frozen shrimp, in fact, were imported into Puerto Rico during the 2000 to 2009 period? No, because this shrimp was imported by JRC Food from seafood sales in New York. Directly, there was no shrimp from India. Okay, got it. I beg your pardon. I thought the answer was you wouldn't know because you bought from somebody else, but you don't know where that somebody else bought from. Apparently, the evidence in the record is that it was bought from India, but my client has no knowledge of that because they bought it from seafood sales. Okay, thank you. Thank you, your honor. Thank you, attorney Gonzalez-Olivencia. At this time, if you would please mute your audio and your video. Attorney Dominguez-Perez, you have a two-minute argument. Please introduce yourself to begin. Yes, good morning, your honors. My name is Igor Dominguez, and I represent Packers Provision. Most of the arguments that I was going to raise have been raised already by sister councils, so I will just limit my argument to a very simple question. Packers Provision is a company that distributes to different restaurants, hotels, supermarkets, and everything foodstuff. One of them is shrimp that they bought from a reputable company in Puerto Rico called JRC Food, and those products are sold. They come frozen, they are stored frozen, and they are sold frozen. The packages are never opened by Packers Provision. So, we know our supplier, and it's a reputable supplier by the name of JRC Food. Second, we are all here talking about saxitoxin contamination. There is no diagnosis that Mr. Gonzalez had saxitoxin intoxication. After 16 days of hospitalization and multiple tests and multiple evaluations by different physicians... Mr. Dominguez, counsel, you can argue that, but I thought Packer had another argument, which is that the causal link that it was Packers Distribution, which went to the restaurant supply place, which then went to this restaurant, is insufficient to establish a causal link. But, you haven't mentioned that argument. Did you make that argument? Yes, and I reaffirm it today, because that's been clear on our brief, and we're not withdrawing it. I've forgotten the statistics, but you said there was only a one in what chance that you were, in fact, the supplier to the restaurant supply company. Yes, because that's the contents and distribution of the shrimps. The shrimps that we bought are five pound boxes, and there's another part that there were some four-pound boxes. Our boxes are the five-pound boxes, and both JR, which was the biggest distributor, and Packers sold GB, which is another part of this litigation. So, they cannot identify clearly from where, from which of the local companies, JB bought the shrimp that was sold to them. That's time. Okay, thank you. Thank you. Thank you, counsel. At this time, if Attorney Dominguez-Perez could please mute his audio and his video, and Attorney Agrediado has a three-minute rebuttal, if he would introduce himself again on the record to do his rebuttal. Certainly. My name is Attorney Jaime Agrediado, and I'm representing Appalens. We would like, again, to clarify a legal point that has been, in our view, erroneously raised by counsel. Under Puerto Rico tort law, it is unnecessary to conclude that a defendant could have anticipated a specific risk or damage or that it would occur as alleged. Under Puerto Rico law, the case law that we have cited in the briefs says that the concept of negligence in Puerto Rico is as embracing as human conduct is. So, therefore, the fact that it was a toxin that ended up contaminating this particular shrimp makes no difference. The question is whether the necessary steps were taken by the defendants. On that point, just two questions. One, could you just clarify, did you make the argument below that an independent ground for finding the restaurant liable was the failure to clean? Yes, and we actually found a patient in Dr. Goldstein's deposition. We have not been able to find it in the appendix, but it is there where he actually mentions. No, no, no, I'm not saying whether there was evidence in the record that would the argument that the reason the restaurant was liable was because there was a failure to clean and that there was a genuine issue of disputed fact as to whether cleaning occurred. 100 percent, yes. Okay, then the second thing is if you could just address the argument that was just made by your opponent. There's no doubt you have a case, at least I understand what your case is as to the idea that a contaminated shrimp was served to your client. Which supplier got the shrimp there is your last opponent just argued that you have a problem on because we can't know from whom the shrimp came. We can know it came from that the restaurant served it, but to get liability against any of the upstream actors, you need to show that the shrimp that was served was one of their shrimp. Certainly. What is the argument on that that would support the ability to find that you can trace this shrimp to one of those particular suppliers? The selling chain of this product was retained an investigator in order to do that. They produced receipts that are on the record and ultimately Junior Seafood sold the shrimp to Packers. But your last opponent just said that it was at the restaurant was shrimp not sold by any of those actors plus shrimp sold by some of those actors. How do we know the shrimp that was served was the shrimp that came from one of the actors you're suing rather than from someone who you're not suing? Because the owner of the restaurant testified that they bought and there is a receipt to that effect that they bought from the immediate Packers. There is evidence on the record on the part of Packers provisions and on the part of the immediate supplier who is not a cooperative in this case that they only purchased shrimp from Packers from no one else. Then they sold the shrimp to the restaurant and there are two because the two witnesses bear the same name because they are father and son but their depositions are in the record and one testifies that they that he bought the shrimp from Packers that they only bought shrimp from Packers. He even said that if someone just just to close what do you say about this five pound box versus four pound box point that that stems from that confusion and the witness that was provided by Packers testified that it was either four or five and that is the same estimate that was provided by Mr. Ramon Gutierrez who actually took the shrimp to the restaurant. So there is really no discrimination based on their own evidence. Okay counsel I want to pose this question to you. There's been this testimony about how the the businesses upstream from the restaurant were supposed to take steps never elaborated so far as I can tell to assure the safety of the product. Can you succinctly give us an idea of what the businesses in the upstream were supposed to do to assure the safety of the product? We're being told that it arrives frozen it remains frozen all the way to the restaurant. So the implication seems to be that they should have somehow tried to establish what was done in India where it was harvested to assure that it was a non-contaminated product. What exactly are they supposed to do? Is that what you're saying they had to go back and find out what was going on in India? Not exactly your honor and let me clarify. Even Apaliza's own food experts uh attest that this is the practice okay. You either if you're Packers for example or junior seafood you have to investigate the safety practices of the harvester meaning you have to know who you're buying from and you have to know that that harvester is a reputable harvester who takes the regular measures that would have prevented this incident like antibacterial measures. A second option that they had was to secure or to check on a memorandum of understanding on whether that country had a memorandum of understanding with the U.S. If that country did not have a memorandum of understanding with the U.S. most definitely they had to check about the safety practices of the harvester. So this is very particular and I would like to clarify that this is very particular about shrimp this is this is not has to do with any other food this has to with shrimp and the good practice according to Dr. Mendonca who is an expert a food expert for defendants is either you look at a memorandum of understanding and you make sure that you're buying from a country that has it uh certainly you have to uh document that you uh that the shrimp gain and clear customs which never happened here and or if you don't do that then you have to that doesn't have a memorandum of understanding uh in order to make sure that the harvester takes uh the adequate steps and again this is undisputed on the record the record shows that um uh Apalis' expert agreeing with this this is the way to go and the evidence on the record is that they did nothing none of them none of the three Apalis. Okay any further questions? No thank you. That concludes arguments in this case attorney a great uh attorney um Lopez de Vitoria, attorney Gonzalez, attorney Domingos Perez you should disconnect from the hearing at this time.